USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___3/18/2025___

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------X
HONG DANIELLE ACCETTOLA,                                :
                                                        :
                                 Plaintiff,             :
                                                        :
                     -v-                                :               23-cv-1983 (LJL)
                                                        :
LINDA MEI HE, WL GLOBAL CORP., WE                      :               OPINION AND ORDER
EDUCATION GROUP, INC., and WAILIAN                      :
OVERSEAS CONSULTING GROUP LTD,                          :
                                                        :
                                 Defendants.            :
--------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Hong Danielle Accettola ("Plaintiff" or "Accettola") brings this action to recover

damages sustained as a result of her allegedly retaliatory discharge by Linda Mei He ("He"), WL

Global Corp. ("WL Global"), WeEducation Group ("WeEducation"), and Wailian Overseas

Consulting Group Ltd. ("Wailian," and, together with He, WL Global, and WeEducation,

"Defendants").  Plaintiff alleges that she was employed by Defendants but was terminated because

she made numerous complaints to an internal auditor about suspected insurance fraud, banking

fraud, and fraud being perpetrated by Defendants in connection with Defendants' applications for

Paycheck Protection Program loans.  Dkt. No. 1-1 ¶¶ 20–26.  Plaintiff claims that her discharge

violated Section 740 of the New York Labor Law ("NYLL"), which provides certain protections

for whistleblowers and prohibits an employer from retaliating against an employee who reports

the employer's unlawful, dangerous conduct, in some circumstances.  *Id.* ¶¶ 27–31; *see* N.Y. Lab.

Law § 740.  Plaintiff also alleges that Defendants' acts negligently and intentionally caused her

emotional distress.  Dkt. No. 1-1 ¶¶ 32–37.

Defendants deny that they employed Accettola, that they engaged in fraudulent conduct,

and that Accettola's termination was retaliatory within the meaning of Section 740.  Dkt. No. 7

¶¶ 10, 15, 20–31; Dkt. Nos. 78, 80.  Defendants allege that Plaintiff worked at WL Global and that she improperly and without authorization enriched herself with WL Global's assets.  Dkt. No. 7 ¶¶ 5, 10–26.  According to Defendants, Plaintiff was terminated as a result of an internal audit that indicated that Plaintiff had engaged in self-dealing at WL Global's expense.  *Id.* ¶ 30.  Defendants assert counterclaims against Plaintiff for fraud, breach of fiduciary duty, breach of the duty of loyalty, unjust enrichment, and conversion.  *Id.* ¶¶ 33–67.

Plaintiff denies Defendants' allegations.  *See generally* Dkt. No. 8.

This Opinion and Order constitutes the Court's findings of fact and conclusions of law for purposes of Federal Rule of Civil Procedure 52(a)(1).  To the extent any statement labeled as a finding of fact is a conclusion of law, it shall be deemed a conclusion of law, and vice versa.

## I.    Procedural Background

Plaintiff initiated this action by filing a complaint in the Supreme Court of New York, County of New York on November 3, 2022.  Dkt. No. 1-1.  On November 18, 2022, before Plaintiff served the complaint on any defendant, Plaintiff filed an amended complaint in the Supreme Court.  Dkt. No. 1 ¶ 2; Dkt. No. 1-2.

On March 8, 2023, Defendants removed the case to the Southern District of New York on the basis of diversity jurisdiction.  Dkt. No. 1.

On March 15, 2023, Defendants filed an answer and counterclaims.  Dkt. No. 7.  Plaintiff filed an answer to Defendants' counterclaims on April 5, 2023.  Dkt. No. 8.

On November 15, 2024, Plaintiff moved to remand the action to state court on the basis that the removal was in violation of the forum defendant rule.  Dkt. No. 68.  On November 19, 2024, the Court denied Plaintiff's motion as untimely.  Dkt. No. 71.

On February 18, 2025, the Court conducted a bench trial on the merits. Dkt. No. 84 ("Trial Tr."). Plaintiff was the lone witness at trial. *Id.*[1]

Summations took place on February 24, 2025. Dkt. No. 86 ("Summation Tr.").

## II.    Findings of Fact

He owned and operated a series of companies in the United States including WL Global, WeEducation, and Wailian. Pl. Ex. 1 ("Accettola Decl.") ¶¶ 10–16.[2] He served as president and/or Chairwoman for all of the companies. Accettola Decl. ¶ 15. Plaintiff was employed as president of WL Global beginning on July 1, 2013. Trial Tr. at 68:1–3. She was an at-will employee and did not have an employment contract. *Id.* at 68:9–13. She was paid by WL Global and had a letter from WL Global confirming her hiring. *Id.* at 68:14–18. Plaintiff never received a letter of employment or a paycheck from any other Defendant. *Id.* at 68:19–23, 69:7–8.

Plaintiff testified that throughout the duration of her employment with WL Global, she made frequent verbal comments to He about supposedly improper conduct by the Defendants but never committed those complaints to writing. *Id.* at 26:14–29:10, 131:5–7. Plaintiff frequently "spoke bluntly" to He about what could or could not be done throughout her employment from 2013 through 2021. *Id.* at 46:1–4, 46:21–47:2. For example, in about 2017 or 2018, Plaintiff "firmly and loudly" objected to He's plan to charge client gift cards to company business cards. *Id.* at 46:5–20. In the past, when Plaintiff raised such objections, Defendants did not retaliate against her for speaking up. *Id.* at 47:3–7. Instead, He typically would just "ignore" Plaintiff's objections. *Id.* at 47:8–10.

---

[1] Defendants' counsel has represented that "[f]or approximately the last two years, Ms. He has been involuntarily detained incommunicado in China and therefore has been unable to participate in this litigation." Dkt. No. 79 ¶ 2.

[2] Plaintiff submitted a declaration in lieu of direct testimony. Trial Tr. at 10:16–11:1.

Plaintiff claims that she ultimately was retaliated against when she raised several objections in connection with Defendants' efforts to obtain loans from the Paycheck Protection Program ("PPP").

Congress created the PPP in 2020 as part of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") to ameliorate some of the effects of the Covid-19 pandemic on small businesses and employees. *See* Pub. L. No. 116-136, § 1102, 134 Stat. 281, 286–94 (2020) (codified at 15 U.S.C. § 636(a)). The PPP authorized the Small Business Administration to guarantee loans to small businesses affected by the pandemic. A borrower's PPP loan would be forgiven upon application so long as the borrower used the funds for certain purposes such as payroll costs, mortgage interest, rent, or utilities. 15 U.S.C. §§ 636(a)(36)(B), (F), 636m(b). The amount of the loan forgiveness available was reduced for employers that reduced the number of employees or reduced employees' salaries. 15 U.S.C. § 636m(d). On December 27, 2020, Congress authorized a "second draw" of PPP loans, but imposed additional eligibility requirements. *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 311, 134 Stat. 1182, 2001–07 (2020). Notably, Congress defined entities eligible for PPP loans to exclude:

> any business concern or entity--
>
> (AA) for which an entity created in or organized under the laws of the People's Republic of China or the Special Administrative Region of Hong Kong, or that has significant operations in the People's Republic of China or the Special Administrative Region of Hong Kong, owns or holds, directly or indirectly, not less than 20 percent of the economic interest of the business concern or entity, including as equity shares or a capital or profit interest in a limited liability company or partnership; or
>
> (BB) that retains, as a member of the board of directors of the business concern, a person who is a resident of the People's Republic of China;

15 U.S.C. § 636(a)(37)(A)(iv)(III)(cc).

At some point Plaintiff spoke at a meeting of representatives from Defendants where she discussed the requirements for filing a proper PPP application. *Id.* at 30:19–31:25. It is unclear when this meeting took place or what PPP requirements Plaintiff explained.[3] Plaintiff also sent He information concerning PPP loan requirements on April 28, 2020. Pl. Ex. 7.

Ultimately, two of the Defendants, WL Global and WeEducation, received PPP loans. Trial Tr. 63:7–10.

Plaintiff admits that there was not anything improper about WL Global's PPP application or its compliance with the loan program. She testified that "WL Global was following the law, 100 percent." *Id.* at 34:22; *see also id.* at 36:22–24 (Q. "[I]s it still your testimony that WL Global acted completely properly under the PPP program?" A. "Yes."); *id.* at 37:3–5; 39:6–8; 40:9–14; 58:14–16. She does not claim WL Global terminated employees or reduced salaries. *Id.* at 58:9–13. In spring 2020, He wanted to reduce salaries and terminate employees, but Plaintiff told her that would be improper and that the PPP loan would not be forgiven and would have to be repaid. *Id.* at 58:18–59:3, 59:12–13; Accettola Decl. ¶ 64. He followed that advice and did not reduce employees' salaries or the size of WL Global's workforce. Trial Tr. 59:4–7; Accettola Decl. ¶ 64.

WeEducation also did not reduce any employee's salary. Trial Tr. 60:16–20. Plaintiff believes WeEducation reduced its headcount but is unsure whether the terminated individuals were employees (who would be protected by the PPP) or independent contractors (who would not be protected). Trial Tr. 60:21–61:21.[4] Plaintiff testified that she believes WeEducation inflated the

---

[3] Plaintiff's declaration states that "[o]n April 28, 2024, [He] organized a five-person WeChat conference meeting regarding PPP utilization rules." Accettola Decl. ¶ 58. Presumably, the year is a typo and Plaintiff meant that the meeting took place on April 28, 2020. However, it still is not clear whether this is the meeting Plaintiff was referring to at trial when she said that she presented as to filing requirements.

[4] Plaintiff testified that she could not identify the terminated individuals by name because the staff was almost entirely Chinese, and she and He called staff by their English names. *Id.* at 123:5–12.

employee headcount in its PPP application. *Id.* at 63:12–24.  Plaintiff did not personally review the PPP applications and does not know what was in them. *Id.* at 54:17–22, 64:4–7.  Plaintiff testified that her belief that WeEducation overstated the number of employees in the PPP loan application is based on the size of the loan received. *Id.* at 63:16–64:14.[5]  The Court finds Plaintiff's vague and conclusory testimony insufficient to support the inference that WeEducation actually terminated employees or that it overstated the number of employees.  At some point between the end of April and May 7, 2020, Plaintiff raised her objections to WeEducation's staff reduction to He.  Trial Tr. at 59:20–60:7.

In December 2020 or in 2021, Plaintiff objected to WeEducation's application for a "second draw" PPP loan on the basis that the owner, He, is a Chinese citizen and that WeEducation does extensive business with a company in China.  Trial Tr. at 96:22–97:21; Accettola Decl. ¶ 65.[6] In response, He undertook to reroute funding from WL Global to WeEducation in an attempt to show that WeEducation was not related to China.  Trial Tr. at 40:23–41:5, 97:22–24; Accettola Decl. ¶¶ 66, 81.  Plaintiff also objected to Defendants switching bank accounts from one bank to another in connection with the PPP applications, but conceded that it was not illegal or improper. Trial Tr. at 58:1–8.

---

[5] In general, the maximum permitted loan amount was the less of: (1) 2.5 times the average total monthly payroll costs incurred or paid by the entity during the 1-year period prior to the loan or during the 2019 calendar year and (2) $2 million.  15 U.S.C. § 636(a)(37)(C)(i).  Plaintiff does not allege the size of the loan or the number of employees WeEducation actually employed during the 1-year period prior to the loan or the 2019 calendar year.

[6] Plaintiff's declaration states that "[o]n or around December 27, 2020,"—the same day Congress authorized the second draw and instituted the China-related eligibility rules—I informed Linda that all her companies would not be eligible to apply for the second round of PPP because of the ineligibility of China-related company rule."  Accettola Decl. ¶ 65.  On cross-examination at trial, Plaintiff testified that in 2021, rather than in 2020, she informed He that the companies had an issue due to ownership by a Chinese citizen and because the companies in the United States had extensive business with a company in China.  Trial Tr. at 97:4–21.

On January 18, 2021, Plaintiff asked He for the information and documents concerning a transfer of funds from WL Global to another company. Pl. Ex. 10. On January 21, 2021, Plaintiff refused to make certain loans from the PPP funds WL Global had received to others of He's family-owned companies because she had not received any loan documents or acquisition plans. Accettola Decl. ¶¶ 67–70. On or about January 22, 2021, He called Plaintiff and told her to use WL Global's PPP funds to make loans to WeEducation and promised that she would prepare a loan document by reaching out to an attorney or an accountant. *Id*. ¶ 72. Plaintiff asked Shaojing Xu ("Xu"), He's nephew, to have a loan invoice approved and signed by He as a record. *Id.* ¶ 73. On January 26, 2021, He called Plaintiff and screamed at her for requesting He's signature on the loan invoice. *Id.* ¶ 74. A few hours later, Xu sent Plaintiff a loan invoice in the amount of $486,000 from WeEducation signed by both He and Xu. *Id.* ¶ 76.

At some point Xu informed Plaintiff that WeEducation had requalified to submit a PPP loan application. *Id.* ¶ 79. On or about April 9, 2021, Plaintiff confronted He about WeEducation's potential reapplication for a PPP loan during a WeChat call. *Id.* ¶ 82. He refused to tell Plaintiff whether WeEducation had applied for PPP again in 2021. *Id.* ¶ 82.

Defendants retained an auditor on July 12, 2021. Trial Tr. at 99:6–7; Accettola Decl. ¶ 84. On July 23, 2021, He called a group meeting including herself, Plaintiff, and the auditor. Plaintiff testified that during the meeting, Plaintiff raised complaints concerning Defendants' supposed bad acts including the loan from WL Global to WeEducation, fraudulent disclosure of revenues to the company's insurance provider to obtain lower premiums, potential immigration fraud by employees, and excessive use of gift cards as payment. Trial Tr. at 80:25–81:4; 98:5–9; Accettola Decl. ¶ 86. Plaintiff requested that the auditor investigate those complaints. Plaintiff does not have any documents corroborating the existence of those complaints. Trial Tr. at 81:5–16, 81:22–

82:1.  Plaintiff conceded that none of the exhibits presented at trial substantiate her testimony that she complained about improper conduct by Defendants.  *Id.* 131:5–7.  Nonetheless, the Court finds Plaintiff's testimony that she raised concerns at the July 23, 2021, meeting to be credible.

Plaintiff testified that she believes Defendants retaliated against her as a result of the July 23, 2021 meeting by removing Plaintiff from certain of her duties, including ordering the auditor to replace Plaintiff in handling financial matters for WL Global and in managing WL Global's main lease.  *Id.* 44:10–17; Accettola Decl. ¶¶ 86–87.  Plaintiff did not offer any testimony that He referenced Plaintiff's complaints in connection with reassigning those duties.  Furthermore, Plaintiff did not explain why, if Defendants wished to punish Plaintiff for her complaints or hinder her ability to blow the whistle at a future date, Defendants would want to reassign those responsibilities or would reassign them to the auditor.  The more logical and plausible inference is that WL Global reorganized duties in light of the addition of a new member of the financial team.

On July 26, 2021, Plaintiff disclosed to the auditor her suspicions regarding Defendants' insurance fraud, banking fraud, immigration fraud, and labor fraud.  Accettola Decl. ¶ 88.  Later in the day, Plaintiff asked for advice regarding proper documentation of the monthly transfers from WL Global to WeEducation in 2021.  *Id.* ¶ 92.  The auditor responded that she did not want to get involved.  *Id.*

In July or August of 2021, the auditor requested Plaintiff's receipts for reimbursement requests dating back to 2013.  Trial Tr. at 82:11–15, 99:8–11; Accettola Decl. ¶ 89.  Plaintiff provided many receipts but was unable to provide receipts for expenses prior to 2019.  Trial Tr. at 82:16–18, 100:24–101:5, 106:4–14, 107:21–24; Pl. Ex. 15.  Plaintiff testified that the reimbursement requests for which she received monies could have amounted to tens of thousands of dollars.  Trial Tr. at 82:19–22.

He told Plaintiff that the auditor was inquiring about Plaintiff's use of the company's credit card points. *Id.* at 108:16–109:4. Plaintiff had opened the card in 2013, and it was associated with her social security number. Accettola Decl. ¶ 21; Trial Tr. at 91:10–92:16. The company bookkeeper kept the card and checks at the office, and He and her executive assistant(s) had full authorization to instruct the bookkeeper to pay expenses by using either the credit card or checks that Plaintiff pre-signed. Accettola Decl. ¶ 23. In exchange, He guaranteed the credit card's monthly automatic payments and Plaintiff was entitled to the points generated from use of the card. *Id.* ¶ 22; Trial Tr. at 91:25–92:16 (Plaintiff testified that He told her: "[Y]our Social Security Number, your points."), 93:10–14. Over the course of her employment, Plaintiff had transferred more than one million credit card points to her personal accounts. Trial Tr. at 88:4–91:7, 102:1–6. Plaintiff conceded that the value of the points was more than $10 thousand and might be more than $20 thousand. *Id.* at 102:7–13. She claims He authorized the transfers but does not have documentation. *Id.* at 91:8–11, 91:20–92:16, 93:3–23. Plaintiff asked He why she did not tell the auditor about the prior authorization. *Id.* at 108:20–24.

On or around August 6, 2021, Plaintiff wrote a memo to the auditor discussing the structure of He's businesses. *Id.* at 126:2–15, 127:24–8; Pl. Ex. 21. The memo was sent to He; there is no direct evidence it was ever sent to the auditor. Trial Tr. 126:21–22. The memo makes no reference to any illegal conduct by Defendants. *Id.* at 128:15–20. Plaintiff testified that she prepared the memo because she was afraid He would tell the auditor "a different story of the company operations" and wanted the memo to guide the auditor as to the available sources of information. *Id.* at 127:24–128:8.

Plaintiff's employment was terminated on November 5, 2021. *Id.* at 94:6–7, 110:15–17; Accettola Decl. ¶ 105. Plaintiff did not have forewarning that she would be terminated. Trial

Tr. 18–22.  She was called into a conference room and then informed of the termination over the phone.  *Id.* at 94:8–11.  She also received a termination letter.  *Id.* at 94:16–17.  Plaintiff believes she was terminated because she "asked too many questions" about the PPP applications, including questions concerning employee count and the transferring of accounts between companies.  *Id.* at 96:22–97:2.  However, no one ever told Plaintiff that her employment was being terminated because she had raised objections to Defendants' conduct, and the termination letter did not say anything of that sort.  *Id.* at 94:12–15, 94:18–22.

Later on the same day that Plaintiff was terminated, He called Plaintiff.  Accettola Decl. ¶ 111.  Plaintiff immediately confronted He concerning the audit and termination.  *Id.*  He ignored Plaintiff's statements and instead offered her a high-paid position as a consultant at some of her companies.  Trial Tr. at 94:23–95:3; Accettola Decl. ¶ 111.  Plaintiff refused.  Accettola Decl. ¶ 111.

Plaintiff did not seek medical treatment or consult a mental health professional in response to the termination.  Trial Tr. at 80:7–19.  Plaintiff merely pursued "normal ways to relax" including taking Tylenol when she was feeling unwell.  *Id.*

Plaintiff did not begin searching for a new job until the summer of 2022, approximately half a year after the termination.  *Id.* at 102:24–103:21.  She eventually procured new employment a few months later.  *Id.* at 103:22–24.

At some point, Plaintiff contacted the U.S. Attorney's Office about Defendants' conduct.  *Id.* at 52:21–53:3.  She spoke with a representative of the office twice.  *Id.* at 53:21–54:1.  The second conversation with a representative of the U.S. Attorney's Office occurred in January or February of 2024—years after Plaintiff had been fired.  *Id.* at 54:2–7.  It is unclear when the first

conversation took place, whether Defendants were aware of Plaintiff's disclosure, or what specific

conduct Plaintiff disclosed to the representative.

### III.    Conclusions of Law

#### A.    Plaintiff's Claims

##### 1.    Whistleblower Retaliation

Plaintiff asserts that Defendants retaliated against her in violation of Section 740 of the

NYLL.  Dkt. No. 1-1 ¶¶ 27–31.  At the time of Plaintiff's termination on November 5, 2021, that

law stated:

> An employer shall not take any retaliatory personnel action against an employee
> because such employee . . . discloses, or threatens to disclose to a supervisor or to
> a public body an activity, policy or practice of the employer that is in violation of
> law, rule or regulation which violation creates and presents a substantial and
> specific danger to the public health or safety, or which constitutes health care fraud.

2019 Sess. Law News of N.Y. Ch. 684 (A. 375).  The law thus required that any employee seeking

Section 740's protection disclose or threaten to disclose actions by the employer that both

(1) actually violated a law, rule, or regulation, and (2) posed a substantial and specific danger to

public health or safety.  *See Rinaldi v. Mills*, 2022 WL 17480081, at *2 (2d Cir. Dec. 7, 2022);

*Coyle v. Coll. of Westchester, Inc.*, 87 N.Y.S.3d 242, 244 (2d Dep't 2018).

Plaintiff has not identified any threat to public health or safety that Defendants' purported

frauds could have represented.  *See Remba v. Fed'n Emp. & Guidance Serv.*, 559 N.E.2d 655,

655–56 (N.Y. 1990) ("[W]e conclude that the conduct complained of—fraudulent billing—is not

the type of violation which creates a substantial and specific danger to the public health or safety."

(quotation omitted)); *Susman v. Commerzbank Cap. Markets Corp.*, 95 A.D.3d 589, 590 (1st Dep't

2012) (although the defendant's dealings with a foreign bank may have violated federal law,

"defendants' alleged financial dealings did not create a substantial and specific danger to the public

health or safety within the meaning of Labor Law § 740"); *Pipia v. Nassau Cnty.*, 826 N.Y.S.2d

318, 320 (2d Dep't 2006) (because the defendants conduct "relates to financial impropriety only, and did not pose a substantial and specific danger to the public health, it was not sufficient to sustain a cause of action alleging a violation of Labor Law § 740(2)").  Plaintiff does not claim that she was entitled to the protection of Labor Law § 740 as it existed at the time her employment was terminated.  Dkt. No. 86 at 30:3–8.  Her claim thus fails under the law as it existed in November 2021.

However, the law was amended on October 28, 2021, with an effective date of January 26, 2022.  *See* 2021 Sess. Law News of N.Y. Ch. 522 (S. 4394-A) ( "2021 Amendment").  In its current form, Section 740 states that:

> An employer shall not take any retaliatory action against an employee, whether or not within the scope of the employee's job duties, because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation or that the employee reasonably believes poses a substantial and specific danger to the public health or safety.

N.Y. Lab. Law § 740(2)(a).  Under the new iteration of the whistleblower law, a plaintiff need only prove either (1) that they reasonably believed the defendant's conduct to violate a law, rule or regulation *or* (2) that they reasonably believed the defendant's conduct posed a substantial and specific danger to the public health or safety.  *See id.*; *Klein v. Brookhaven Health Care Facility*, 2024 WL 5074485, at *2 (2d Cir. Dec. 11, 2024) (summary order).  Plaintiff argues that the law applies retroactively such that she need not prove either that Defendants' conduct (1) actually violated a law, rule, or regulation, or (2) posed a substantial and specific danger to public health or safety.   "The Second Circuit has not yet ruled on retroactive application of the 2021 amendments, and the few courts that have considered the issue have been divided."  *Rackley v. Constellis, LLC*, 2024 WL 3498718, at *26 (S.D.N.Y. June 17, 2024) (collecting cases), *report and recommendation adopted as modified*, 2024 WL 3824108 (S.D.N.Y. Aug. 14, 2024).

"In determining whether a statute should be given retroactive effect," the New York Court of Appeals "ha[s] recognized two axioms of statutory interpretation." *In re Gleason (Michael Vee, Ltd.)*, 749 N.E.2d 724, 726 (N.Y. 2001). First, amendments to New York laws are "presumed to have prospective application unless the Legislature's preference for retroactivity is explicitly stated or clearly indicated." *Id.*; *see also People v. Oliver*, 134 N.E.2d 197, 200 (N.Y. 1956) ("Statutes dealing with matters other than procedure are not to be applied retroactively absent a plainly manifested legislative intent to that effect."). Second, "remedial legislation should be given retroactive effect in order to effectuate its beneficial purpose." *Gleason*, 749 N.E.2d at 726. "Remedial statutes are those designed to correct imperfections in prior law, by generally giving relief to the aggrieved party." *Nelson v. HSBC Bank USA*, 929 N.Y.S.2d 259, 263 (2d Dep't 2011) (quotation omitted). In other words, a remedial amendment does not merely update the law; it clarifies what the law "was always meant to say and do." *Bros. v. Florence*, 739 N.E.2d 733, 737 (N.Y. 2000) (emphasis omitted); *see also Nelson*, 929 N.Y.S.2d at 263; *CFCU Cmty. Credit Union v. Hayward*, 552 F.3d 253, 262 (2d Cir. 2009).

However, the New York Court of Appeals has warned that "such construction principles are merely navigational tools to discern legislative intent." *Majewski v. Broadalbin-Perth Cent. Sch. Dist.*, 696 N.E.2d 978, 980 (N.Y. 1998) (quotation omitted). "Other factors in the retroactivity analysis include whether the Legislature has made a specific pronouncement about retroactive effect or conveyed a sense of urgency; whether the statute was designed to rewrite an unintended judicial interpretation; and whether the enactment itself reaffirms a legislative judgment about what the law in question should be." *Gleason*, 749 N.E.2d at 726.

The 2021 Amendment does not explicitly state or clearly indicate a preference for retroactive application. Nothing in the text of the enacting legislation so much as references

possible retroactivity. Indeed, the bill states that "[t]his act shall take effect on the ninetieth day after it shall have become a law." 2021 Sess. Law News of N.Y. Ch. 522 (S. 4394-A); *see Gold v. N.Y. Life Ins. Co.*, 730 F.3d 137, 143 (2d Cir. 2013) (noting that "neither the text nor the legislative history mentions retroactivity" and that the law provided for a prospective effective date); *People v. Stephenson*, 823 N.Y.S.2d 789, 790 (3d Dep't 2006) ("[E]xplicit legislation setting forth a prospective effective date is sufficient to overcome any presumption of retroactivity." (quoting *People v. Walker*, 810 N.Y.S.2d 530, 531 (3d Dep't 2006))); *People v. Parmelee*, N.Y.S.2d 318, 320 (2d Dep't 1992) ("[T]he evidence of the Legislature's intent that the amendment should not apply retroactively, as manifested in the postponement of the amendment's effective date, governs the applicability of the amendment and requires us to hold that the amendment should not be applied retroactively.").

If the Legislature's retroactive intent is not clear from the face of the statute, "courts then look to the legislative history." *Gold*, 730 F.3d at 143 (citing *Majewski*, 696 N.E.2d at 981). Several of the courts addressing the question of the 2021 Amendment's retroactive application have cited the Sponsor's Memorandum as evidence of the 2021 Amendment's remedial nature. *See, e.g.*, *Callahan v. HSBC Sec. (USA) Inc.*, 723 F. Supp. 3d 315, 326 (S.D.N.Y. 2024); *Zhang v. Centene Mgmt. Co., LLC*, 2023 WL 2969309, at *15 (E.D.N.Y. Feb. 2, 2023); *Williams v. Arc of Rensselaer Cnty.*, 175 N.Y.S.3d 458, 459 (N.Y. Sup. Ct. 2022). However, the Sponsor's Memo does not in any way allude to retroactive application. It explains that:

> Current law provides that an employee is only protected if they disclose to a supervisor or public body an unlawful activity, policy, or practice of the employer that creates and presents a substantial danger to the public health or safety, or that which constitutes health care fraud. Thus, an employee reporting any myriad of illegal activities that do not directly affect public health or safety, from sexual harassment to tax evasion, may be at risk for being retaliated against by their employer with no protection in law.

N.Y. Spons. Memo., 2021 S.B. S4394A. The Sponsor's Memo further explains that "the Civil Rights Law was amended in 1986 to widen the protection for a public employee by providing protection for disclosure of information which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action." *Id.* Accordingly, "[a]s was pointed out by the Court of Appeals in 1996, New York maintains two different standards for providing a remedy to employees who have been unlawfully retaliated against by their employers," and "[t]here is no reason to have two disparate standards for the maintenance of retaliation actions, and no reason to afford public employees with a greater remedy than possessed by employees in the private sector." *Id.* (citing *Bordell v. Gen. Elec. Co.*, 667 N.E.2d 922 (N.Y. 1996)). None of this is clearly suggestive of retroactive intent.

Other courts have suggested that the Sponsor's note that the prior law "ha[d] long been restrictive" is evidence of the 2021 Amendment's remedial nature. *See Zhang*, 2023 WL 2969309, at *16. But an amendment may not be classed as remedial and given retroactive application simply because it expands a legal cause of action. "Classifying a statute as 'remedial' does not automatically overcome the strong presumption of prospectivity since the term may broadly encompass any attempt to 'supply some defect or abridge some superfluity in the former law.'" *Majewski*, 696 N.E.2d at 980. Nearly any amendment can be described as remedial because for the Legislature to determine that a law needs amending, it must have deemed some aspect of the previous version deficient. *See Majewski*, 696 N.E.2d at 980.

Instead, courts ask the narrower question of whether "the purpose of new legislation is to clarify what the law was always meant to say and do." *Id.* at 981 (citing *Matter of OnBank & Tr. Co.*, 688 N.E.2d 245, 248 (N.Y. 1997)). For example, in *OnBank*, the New York Court of Appeals noted that the amendment's sponsor stated that "'[a] controversy has recently arisen' regarding

15

Banking Law § 100–c(3), the amendment 'was intended to clarify' that statute, and the Banking Law 'does not and never has' required trustees to absorb mutual fund fees." 688 N.E.2d at 248 (citation omitted). The court found those statements indicative of intended retroactivity because they showed that the amendment stated the language that the Legislature intended to rule and that should have been in effect even before the Legislature intervened to clarify. *Id.* Where the Legislature signals its "intent to provide an immediate corrective to unintended judicial interpretations . . . , it would seem incongruous for the Legislature, . . . to have allowed [conduct] that occurred before [the amendment] was enacted to be exempt from that [amendment's] reach." *Bank of N.Y. Mellon v. Del Rio*, 224 N.Y.S.3d 30, 33 (1st Dep't 2024) (punctuation omitted). Nothing in the 2021 Amendment's sponsor memo or its other legislative history indicates such a remedial intent.

Indeed, a brief review of Section 740's legislative history reveals that the 2021 Amendment is far from an "immediate act" to correct an "unintended judicial interpretation"—the courts' longstanding interpretation was not unintentional, nor was the Legislature's amendment immediate. The New York Legislature originally enacted Section 740 in 1984.[7] The first version's prohibition against whistleblower retaliation used precisely the same language the statute used at the time of Plaintiff's termination. *See* 1984 Sess. Law News of N.Y. Ch. 660, § 2. The Bill Jacket that accompanied the original enacting legislation stated that the law's limited scope was

---

[7] The law was enacted in response to the New York Court of Appeals' decision in *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86 (N.Y. 1983). In that case, the Court of Appeals rejected the plaintiff's argument that an exception to the common-law rule that an employer could not be held liable for terminating an at-will employment relationship should be made "to hold employers liable for dismissal of employees in retaliation for employee conduct that is protected by public policy." *Id.* at 89–90. The Court of Appeals instead held that because the issue involved "perception and declaration of relevant public policy," the question of what, if any, whistleblowing is worthy of protection is "better left to resolution at the hands of the Legislature." *Id.* The question of what type of disclosure merited job protection was thus expressly highlighted to the Legislature.

intentional: "This bill protects public and private employees only in situations where [the disclosed] violations of law, rule or regulation would adversely affect public health and safety." *Remba v. Fed'n Emp. & Guidance Serv.*, 545 N.Y.S.2d 140, 142 (1st Dep't 1989) (quoting the Bill Jacket), *aff'd*, 559 N.E.2d 655. The New York Attorney General similarly issued a memorandum recognizing that "[t]he bill is intended to protect employees who disclose to governmental authorities information about . . . employer wrongdoing which is dangerous, unsafe or inimical to the public welfare." *Id.*[8]

Against this backdrop, it is apparent that the 2021 Amendment to Section 740 does not merely clarify what the law "was always meant to say and do." *Gottwald v. Sebert*, 220 N.E.3d 621, 633 (N.Y. 2023) (rejecting retroactive application where "this is not a case where the legislative history indicates that the purpose of the new legislation is to clarify what the law was always meant to say and do or to correct an overly narrow interpretation by the courts," but "[r]ather, the legislature intended the amendments to greatly expand the limited coverage offered by the original . . . statute"). Furthermore, giving the 2021 Amendment retroactive effect is not necessary to "effectuate its beneficial purpose." *Palin v. N.Y. Times Co.*, 510 F. Supp. 3d 21, 26 (S.D.N.Y. 2020) (quoting *Gleason*, 749 N.E.2d at 726). Section 740 is intended to encourage certain employee disclosures. *See Collette v. St. Luke's Roosevelt Hosp.*, 132 F. Supp. 2d 256, 271 (S.D.N.Y. 2001) (Lynch, J.) ("Although the Whistleblower Act has a limited scope—only protecting the disclosure of unlawful practices which present a substantial and specific danger to the public health or safety—it does protect, and intends to encourage, employee disclosures that

---

[8] At the time, several proponents of the bill were reportedly upset by its limited nature—further confirming that the restriction was well understood. *See* Michael Oreskes, *A Bill to Protect Workers' Right Gains in Albany*, N.Y. Times, June 27, 1984, at B2 (reporting that "groups that have been pushing for such a measure . . . were disappointed because the bill covered only health and safety threats and not white-collar crime").

fall within it." (emphases omitted)).  Although the 2021 Amendment may encourage a broader swath of future whistleblowers to come forward, retroactive application does not aid that goal. The whistleblowers who would be protected by retroactive application already came forward with no reasonable expectation of legal cover; retroactively applying Section 740 provides no further incentive once they have made the subject disclosures.

Absent a specific pronouncement of retroactivity, a sense of urgency, a clarification of an unintended judicial interpretation, or any other indication that the Legislature intended the 2021 Amendment to apply retroactively, the Court will not part from the presumption that the 2021 Amendment applies only prospectively.  *See Gleason*, 749 N.E.2d at 726.  Instead, the Court takes the Legislature at its word: the 2021 Amendment was intended to take effect ninety days after it became law.

Therefore, because the 2021 Amendment does not apply to Plaintiff's termination, to succeed on her Section 740 claim, Plaintiff must prove that she disclosed that Defendants actually violated a law, rule, or regulation, in a manner that poses a substantial and specific danger to public health or safety.  *See Rinaldi*, 2022 WL 17480081, at *2.  Because she has not shown that her disclosures regarding Defendants' PPP loans related to any public health or safety risk, Plaintiff's whistleblower retaliation claim fails.  *See Remba*, 559 N.E.2d at 655–56. [9]

Even if Plaintiff could show that Defendants' conduct represented a substantial and specific danger to public health or safety, Plaintiff's whistleblower retaliation claim would fail because she has not proved causation, *i.e.*, that she was terminated *because* she blew the whistle on Defendant's

---

[9] Because the Court finds that Plaintiff has not shown a substantial threat to public health or safety, the Court need not address whether Defendants' conduct constituted an actual violation of law, rule, or regulation.

misconduct.  *See Pardo v. Tomas Infernus DVM, P.C.*, 2024 WL 4276204, at \*5–6 (E.D.N.Y. Sept. 24, 2024) (stating that Section 740 claims require causation).

Plaintiff claims that Defendants retaliatorily terminated her on November 5, 2021, in response to Plaintiff's disclosure of Defendants' fraudulent financial conduct.  However, there is little in the record to support the inference that Plaintiff's termination was undertaken in response to any disclosure by Plaintiff.  The record shows that over the course of her multi-year employment, Plaintiff raised frequent "blunt" objections to Defendants' conduct when she disagreed with a course of action proposed or adopted by Defendants.  Trial Tr. at 26:14–29:10, 46:1–4, 46:21–47:2, 131:5–7.  Plaintiff does not contest that she did not face retaliation in response to her earlier objections.  Plaintiff provides no evidence other than the fact of her termination to show that her later objections were met with a different, more hostile response than her earlier objections.  *Id.* at 47:3–10.

The simple fact that a person was terminated does not itself permit the factfinder to determine that such termination was retaliatory.  Plaintiff does not claim to have ever been told that her employment was being terminated because she had raised objections to Defendants' conduct.  *Id.* at 94:12–15, 94:18–22.  The time between disclosure and termination also does not support an inference of retaliation.  According to Plaintiff's testimony, the last disclosure of any even potential wrongdoing by Defendants that preceded her termination was on July 26, 2021, when she informed the auditor of her suspicions regarding Defendants' insurance fraud, banking fraud, immigration fraud, and labor fraud.  Accettola Decl. ¶ 88.[10]  More than three months passed

---

[10] There is no indication that Defendants became aware of the July 26, 2021, disclosure at any point prior to Plaintiff's termination as Plaintiff's testimony indicates that she only informed the auditor, and it is unknown who, if anyone, the auditor informed.  *Id.*  Regardless, a few days prior, on July 23, 2021, Plaintiff raised related issues at the meeting with both the auditor and He present.  Trial Tr. at 80:25–81:4; 98:5–9; Accettola Decl. ¶ 86.

between the date of Plaintiff's last disclosure and her ultimate termination. "Although the Second Circuit has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship, district courts in this Circuit have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891, at *21 (E.D.N.Y. Apr. 19, 2007) (Bianco, J.) (citation omitted) (collecting cases); *accord Sealy v. State Univ. of N.Y. at Stony Brook*, 834 F. App'x 611, 614 (2d Cir. 2020) (summary order) ("[W]e have held that adverse employment actions occurring approximately three months after protected activity are too attenuated to give rise to an inference of retaliation."); *Payne v. Cornell Univ.*, 2022 WL 453441, at *4 (2d Cir. Feb. 15, 2022) (summary order); *Brown v. City of New York*, 622 F. App'x 19, 20 (2d Cir. 2015) (summary order); *Dawson v. Long*, 2018 WL 5914859, at *16 (S.D.N.Y. Aug. 20, 2018) (collecting cases), *report and recommendation adopted*, 2018 WL 4519199 (S.D.N.Y. Sept. 20, 2018). No other factors suggest that the Court should infer causation from the longer time frame. *See Bamba v. U.S. Dep't of Homeland Sec.*, 2024 WL 3924810, at *19 (S.D.N.Y. Aug. 23, 2024) (noting that, for example, "[c]ausation may be inferred from a longer gap when there is evidence that the 'adverse action occurred at the first actual opportunity to retaliate'" (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013)).

In fact, there is evidence that Plaintiff's termination was nonretaliatory, as He offered to rehire Plaintiff as a consultant the same day as Plaintiff's termination. *Id.* at 94:23–95:3; Accettola Decl. ¶ 111; *see Manzolillo v. Cooke*, 438 F. Supp. 2d 311, 314 (S.D.N.Y. 2006) ("[D]efendant's offer to rehire plaintiff . . . may constitute evidence in defendant's favor as to any discriminatory intent.").

Plaintiff's Section 740 whistleblower retaliation claim fails due the lack of evidence that she was terminated due to her disclosures as well as due to the lack of evidence that the complained-of misconduct represented a substantial threat to public health and safety.

### 2. Intentional Infliction of Emotional Distress

Plaintiff's Second Cause of Action is for intentional infliction of emotions distress.  Dkt. No. 1-1 ¶¶ 32–34.

"Under New York law, a claim for intentional infliction of emotional distress [] requires: '(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress.'"  *HC2, Inc. v. Delaney*, 510 F. Supp. 3d 86, 104 (S.D.N.Y. 2020) (quoting *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999)); *see also Howell v. N.Y. Post Co.*, 612 N.E.2d 699, 702 (N.Y. 1993).  "The conduct alleged must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'"  *Crews v. Cnty. of Nassau*, 996 F. Supp. 2d 186, 213 (E.D.N.Y. 2014) (Bianco, J.) (quoting *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir. 1985)).  "Further, the fourth element, severe emotional distress, must be supported by medical evidence."  *Id.*; *see also Biberaj v. Pritchard Indus., Inc.*, 859 F. Supp. 2d 549, 564–65 (S.D.N.Y. 2012) (holding that to establish IIED, the plaintiff "must plead and prove conduct which is so extreme and outrageous that it transcends the bounds of decency as to be regarded as atrocious and intolerable in a civilized society, and must also present medical evidence in support of her claim").

Plaintiff has not identified any extreme and outrageous conduct perpetrated by Defendants. "[C]ourts within this circuit have generally found allegations of discrimination, wrongful termination, and denial of benefits insufficient to satisfy the rigorous standard for extreme and

21

outrageous conduct." *Gioia v. Forbes Media LLC*, 2011 WL 4549607, at *12 (S.D.N.Y. Sept. 30, 2011) (Sullivan, J.) (collecting cases), *aff'd*, 501 F. App'x 52 (2d Cir. 2012); *see also Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 631 (E.D.N.Y. 2012) (collecting cases). As the New York Court of Appeals has noted, courts should be particularly wary of wrongful termination claims masquerading as claims for IIED because a "plaintiff should not be allowed to . . . subvert the traditional at-will contract rule by casting his cause of action in terms of a tort of intentional infliction of emotional distress." *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 90 (N.Y. 1983). The only purportedly upsetting action was Plaintiff's termination, which took place over the phone and did not transcend the bounds of decency. Trial Tr. at 94:8–11. Courts have rejected IIED claims predicated on more momentous terminations. *See, e.g. Ahmed v. Gateway Grp. One*, 2012 WL 2061601, at *3 (E.D.N.Y. June 7, 2012) (plaintiff was verbally abused and screamed at prior to termination); *House v. Wackenhut Servs., Inc.*, 2011 WL 6326100, at *5 (S.D.N.Y. Dec. 16, 2011) (plaintiff was subjected to false disciplinary charges prior to termination).

Plaintiff's IED claim additionally fails for lack of evidence that she suffered severe emotional distress as a result of the termination. Her testimony at trial that she did not seek medical treatment or consult a mental health professional and instead pursued "normal ways to relax" such as taking a Tylenol, is not medical evidence and in fact undermines any inference of severe emotional distress. *See Luna v. Am. Airlines*, 676 F. Supp. 2d 192, 205 (S.D.N.Y. 2009) ("[P]sychiatric testimony may suffice for such a guarantee of genuineness, but a plaintiff's uncorroborated testimony of upsetness will not." (quotation omitted)), *aff'd sub nom. Luna v. Am. Airlines, Inc.*, 578 F. App'x 58 (2d Cir. 2014); *Crews*, 996 F. Supp. 2d at 213 (plaintiff's testimony does not suffice absent medical evidence). Courts routinely reject claims for intentional infliction of emotional distress where the plaintiff fails to present medical evidence demonstrating severe

emotional injury.  *See, e.g., id.*; *Woods v. Sieger, Ross & Aguire, LLC*, 2012 WL 1811628, at *8 (S.D.N.Y. May 18, 2012); *Pierre-Antoine v. City of New York*, 2006 WL 1292076, at *8 (S.D.N.Y. May 9, 2006) (Lynch, J.); *Singh v. U.S. Sec. Assocs., Inc.*, 2005 WL 236511, at *14 (S.D.N.Y. Feb. 1, 2005), *aff'd*, 152 F. App'x 36 (2d Cir. 2005); *see also Okudinani v. Rose*, 779 F. App'x 768, 772 (2d Cir. 2019) (summary order) ("The overwhelming weight of authority from the appellate divisions, bolstered by dicta from the New York Court of Appeals, strongly suggests that summary judgment is appropriate in New York where, as here, plaintiffs failed to introduce sufficient medical evidence to support such a claim.") (collecting cases).

### 3.     Negligent Infliction of Emotional Distress

Plaintiff's Third Cause of Action is for negligent infliction of emotions distress.  Dkt. No. 1-1 ¶¶ 35–37.

A Plaintiff claiming "negligent infliction of emotional distress under New York law must show '(1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm.'" *Fox v. Starbucks Corp.*, 2023 WL 407493, at *2 (2d Cir. Jan. 26, 2023) (summary order) (quoting *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021)).  "In New York, a cause of action for negligent infliction of emotional distress arises only in unique circumstances, when a defendant owes a special duty only to plaintiff or where there is proof of a traumatic event that caused the plaintiff to fear for her own safety." *Starr v. Time Warner, Inc.*, 2007 WL 4144627, at *6 (S.D.N.Y. Nov. 21, 2007) (Chin, J.) (quotation omitted); *see also Santana v. Leith*, 985 N.Y.S.2d 147, 149 (2d Dep't 2014) (under New York law, an NIED claim "generally must be premised upon a breach of a duty owed to the plaintiff which either unreasonably endangers a plaintiff's physical safety, or causes the plaintiff to fear for his or her own safety").

Plaintiff no evidence that any of the Defendants' conduct implicated her physical safety, and her NIED claim therefore fails under New York law. *See Abadi v. Am. Airlines, Inc.*, 2024 WL 1346437, at *44 (S.D.N.Y. Mar. 29, 2024).

### B.  Defendants' Counterclaims

Defendants assert counterclaims for fraud, breach of fiduciary duty, breach of the duty of loyalty, unjust enrichment, and conversion. Dkt. No. 7 ¶¶ 33–67.

"To establish fraud, a plaintiff must prove a misrepresentation or a material omission of fact which was known to be false by the defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance, and injury." *DF Ventures, LLC v. Aaron & Gianna, PLC*, 2024 WL 916343, at *12 (S.D.N.Y. Mar. 4, 2024) (quoting *Curtis-Shanley v. Bank of Am.*, 970 N.Y.S.2d 830, 832 (2d Dep't 2013)). "Under New York law, a claim for '[b]reach of fiduciary duty requires (1) the existence of a fiduciary duty owed by the defendant; (2) a breach of that duty; and (3) resulting damages.'" *Spencer-Smith v. Ehrlich*, 2024 WL 709291, *6 (S.D.N.Y., 2024) (quoting *Jones v. Voskresenskaya*, 5 N.Y.S.3d 16, 17 (1st Dep't 2015)) (citing *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011)).[11] A plaintiff claiming unjust enrichment "must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (quotations omitted). "A conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006).

---

[11] A breach of the duty of loyalty is one species of breach of fiduciary duty. *See Abouelmakarem v. MDNMA Inc.*, 2022 WL 1620302, at *2 (S.D.N.Y. May 20, 2022).

Defendants' counterclaims are premised on what they claim were Plaintiff's unauthorized use of the company credit card points and her failure to substantiate tens of thousands of dollars' worth of reimbursements. Dkt. No. 7 ¶¶ 33–67; Dkt. No. 78 at 13; Dkt. No. 86 at 18:2–19:11. Defendants' argument fails on the facts as Defendants do not show that Plaintiff's use of the credit card points was unauthorized or that Plaintiff received any unwarranted reimbursement.

Plaintiff testified that He had authorized her personal use of the credit card points because the card was connected to Plaintiff's credit and was associated with Plaintiff's social security number. Accettola Decl. ¶¶ 21–23; Trial Tr. at 91:10–92:16. Defendants argue that there is no corroborating evidence of He's authorization. Trial Tr. at 91:10–14, 93:10–23. However, there is also no evidence undermining Plaintiff's testimony regarding authorization, which the Court finds to be credible. It makes sense for Plaintiff to have been granted the benefit of the points in exchange for leveraging Plaintiff's credit score and exposing her to steep financial consequences if the company ever missed a payment.

Next, Plaintiff admitted that in mid-2021, she was unable to provide the auditor with receipts for reimbursement requests for purchases she made between 2013 and 2019. *Id.* at 82:16–18, 100:24–101:5, 106:4–14, 107:21–24; Pl. Ex. 15. However, that does not necessarily indicate that her reimbursement requests were improper such that she defrauded, was unfaithful to, or was otherwise unjustly enriched by Defendants. Instead, Plaintiff claims that receipts were submitted to the bookkeeper who was then responsible for maintaining either the hard copies or electronic copies of the receipts. Accettola Decl. ¶ 38. Although it might have been wise for Plaintiff to keep her own copies in addition to the bookkeeper's files, the fact that she did not maintain the receipts for an audit or legal proceeding several years in the future does not give rise to an inference that Plaintiff submitted bogus reimbursement requests. Defendants provide no evidence that

Plaintiff ever submitted an improper request for reimbursement, let alone that she received reimbursement for an improper request.  The Court credits Plaintiff's testimony.

Defendants accordingly fail to show that Plaintiff made a misrepresentation, breached a duty, was enriched in any "unjust" manner, or seized monies that rightfully belonged to Defendants.  All of Defendants' counterclaims fail.

## CONCLUSION

Plaintiff's claims are dismissed.  Defendants' counterclaims are dismissed.

The Clerk of Court is respectfully requested to enter judgment and to close this case.

SO ORDERED.

Dated: March 18, 2025
      New York, New York

_____
LEWIS J. LIMAN
United States District Judge